Second case is number 22-138.3, Securities and Exchange Commission v. Michael Furman. Good morning. May I please the Court? I'd like to first thank your honors for allowing us the opportunity to argue this case in front of you. This is actually the first time I've ever had the privilege of making oral argument in front of any appellate court. I first got into this case back in September of 2021 as a pro bono matter to help out Mr. Furman as a friend. When we entered into this case, we immediately requested that the SEC provide us with discovery concerning the specific claims related to Mr. Furman. In particular, we were looking for information concerning the issue of the amount of money that a fund he was managing called Fidelis had received from the SEC. This case involves a much larger investment, which would later become Scheme, in a series of enterprises called PAR Funding. Our client, Mr. Furman, operated a feeder fund called Fidelis. Fidelis represented less than 1 percent of the total money that was invested in the fund. In fact, 99.4 percent of the other funds were invested outside of Fidelis. We sought this information. We also asked appropriately for some clarification as to the specific misstatements or omissions that Mr. Furman was accused of making in connection with the fraud case. Shortly before trial, all of the other defendants representing the other 99.4 percent of the money and the vast majority of issues settled the case. Immediately after that, and in part because I as a sole practitioner had a trial conflict with my largest client having a scheduling issue at the same time, but also having co-counsel, I was forced to withdraw from that representation and immediately prepare for trial in this matter. We asked the Court to require the SEC to provide us with more definite statements as to what was stated by Mr. Furman. The trial court declined the opportunity. The SEC also sought to prohibit Mr. Furman from testifying, claiming that because at the very beginning of the case he asserted his Fifth Amendment rights, he should not be allowed to testify at all. Mr. Furman, however, had also testified as to every single issue measurable in the case for more than eight hours of deposition with the SEC after they asked him to provide additional documents, which he didn't provide. But Judge Ruiz ultimately took back part of the order and allowed Mr. Furman to testify about a number of matters, right? He did take back his order in part, but the problem was that a lot of the damage had already been done at that juncture because the SEC had been sitting there for almost two and a half hours asking Mr. Furman questions about statements, acts, or omissions that were made, which he could have provided a very simple explanation to a jury, but was prohibited from answering questions. So, for example, it would be, Mr. Furman, here in this request for admission, it says you lied on this matter. Mr. Furman would then try to explain it, but he'd be prohibited from doing so because he previously pled the Fifth. And in fact, we asked Judge Ruiz to provide a curative instruction to at least explain, you know, the issues, the lack of prejudice, and more importantly, which is the bigger issue, to conduct a weighing or basically an analysis as to the prejudice in a balancing test when it comes to a circumstance like this. He chose not to do so, which resulted in prejudice. Separately, Judge Ruiz also relied on the unsubstantiated chart that was produced by Mr. Bradley Sharp with no evidence as a business record. This is very important to the entirety of the case because during trial, we were not on notice, nor were we given any ability to actually cross-examine Mr. Sharp about this document. This was a chart of damages that the trial court then used to calculate the entirety of disgorgement as to Mr. Furman. Was that while or during? Both. Or post-verdict? So, what the trial court did for the post-judgment disgorgement proceedings in this case, Your couldn't introduce evidence because way earlier on in the case, Mr. Furman pled the Fifth Amendment, even though afterwards, Judge Ruiz backed off from that order so that he re-kind of instituted the same kind of draconian measures, and then separately as well, the only evidence that was relied on was Mr. Sharp saying, hey, I read this chart. You have both a substantive argument with regard to Mr. Furman being not allowed to testify at the beginning, and you have a procedural argument about that too. That is, Judge Ruiz not giving an instruction, not undoing the prejudice that you say occurred. Let me take the substantive part of that first. At the end of the day, was there any issue that Mr. Furman was prohibited from testifying about that you think he should have been allowed to testify about? I don't believe that there was an issue that he was, well, yes, I do. In terms of the disgorgement proceedings, so if you could... Let's take disgorgement separately because that's a post-judgment matter. Let's talk about the trial first. Okay. The merits trial.  When Judge Ruiz allowed Mr. Furman to testify, was there any substantive matter that he was precluded from offering testimony on? He and also the witnesses that we sought to introduce evidence from concerning prior consistent statements, and Mr. Furman's disclosure of certain facts to investors was prohibited, but otherwise the Fifth Amendment issue did not preclude him from specifically eliciting testimony on those matters. Okay. So I don't want words in your mouth, but your argument with regards to the Fifth Amendment issue with regard to Mr. Furman specifically, not to other witnesses, is that Judge Ruiz erred by not undoing the prejudice that had occurred based on his initial ruling. Yes. That is one component of why we believe that there was errors in this prejudice also kind of culminated or was cumulative throughout the course of the trial. Because not only was there the Fifth Amendment issue, but there was also the undisclosed witness, Mr. Weisenstein, that was brought in, in quote, rebuttal, even though he was never disclosed as a witness in response to questions that were listed by the SEC themselves. But you're not generally required to disclose rebuttal witnesses, right? You are actually, Your Honor. Under Rule 26, the specific language of the disclosures included rebuttal witnesses or anybody who has knowledge of the facts and circumstances given rise to the case. So if somebody has knowledge of, for example, our client and interviewed them, you do have to disclose that this person has knowledge of the client and otherwise would be entitled to or would otherwise be entitled to engage in discovery as it relates to those issues. So this is not a rule? So this is more than just not listing the person as a witness. You're saying that the SEC failed in its Rule 26 disclosures. Correct. And also, more importantly, it wasn't a rebuttal witness. And his questioning further prejudiced us because he testified based solely on notes that he had previously taken, which the SEC questioned about to refresh his recollection. But at the same time, we were prohibited from seeing these notes based on the SEC's assertion of the investigative privilege. So there's a lot of problems with that testimony and the assertion of the investigative privilege throughout the course of the trial proceedings. Explain that to me. You're telling me that the witness was, had his recollection refreshed on rebuttal testimony by reference to some notes that he had taken? Correct. And his sole basis of knowledge was the notes that he had reviewed prior to testifying. And you're saying you were precluded from reviewing those notes? Yes, sir. And the SEC asserted the investigative privilege. And this is part of one of the other issues that happened throughout the course of this trial. The other governmental entities were permitted to provide testimony and commentary about Mr. Fuhrman or other issues. And then when we would ask subsequent questions to verify some of his statements, we were prohibited from obtaining that information under the investigatory privilege, which is a qualified privilege. And, Your Honor, that also, I think it's important, too, because I'm running low on time, to address the integration issue as well separately, which kind of really did create the biggest level of problems throughout the course of this trial. That's only as to count seven, right? It says to count seven, but it also had a huge impact as well as it relates to the fraud counts. The specific allegations or misstatements that Mr. Fuhrman was alleged to have made were never disclosed in the complaint. And we asked for a more definite statement. It was never provided. Separately, during closing argument... I know you weren't involved in the case until very late, so I'm not asking you personally, but did Mr. Fuhrman, when he was acting pro se or when he had counsel, if he had counsel before, propound discovery to the SEC asking for what statements on his behalf the SEC was relying on? I'm not sure the extent to which that happened, but when we entered an appearance in the case, we immediately reached out to counsel for the SEC. Counsel for the SEC agreed in writing, via e-mail, to produce the discovery that was limited. We propounded the discovery onto them. The SEC then refused to do so, claiming that the deadline had expired and then we were prohibited by court order from otherwise obtaining the discovery that the SEC had agreed to provide us previously. But the deadline had expired. In the long sense, it expired, right? It had expired by about a week or two, as I recall. I'm not sure. How long was that? I'm not sure, but the bigger and more important takeaway is the SEC's position at that time was that disgorgement was not relevant. And then the entire evidence that was used by the trial court for disgorgement was the testimony that was enlisted during trial, based on an unauthenticated chart. And at the same time, when you talk about the Fifth Amendment and what happened... Why do you say the chart was unauthenticated? It's both failing to lay the foundation or predicate for a business record and failing to authenticate it is the problem. With Mr. Sharpe... Authentication and business record admission are two different concepts. Correct. Do you have one or the other or are you going to have problems with both? Well, there was problems with both because Mr. Sharpe didn't have knowledge as to how the document was kept or maintained in the ordinary course of business. He hadn't done anything to determine or verify where it was. And there was no effort undertaken prior to testifying to determine what or how these numbers on the chart came from or why they were in existence. Who created the chart? It was created by a third-party company that wasn't even Fidelis or a different entity. And we objected based on the fact that there's a failure to lay the foundation or the predicate. And Judge Ruiz summarily overruled the objection, saying that a trustee in bankruptcy sometimes can have a lessened burden of proof for certain business records while ignoring the requirement that the trustee actually in fact do the due diligence to lay the foundation for a business record. Okay. You've saved all of your time for rebuttal. You can keep going and eat into that time if you want or you can save the full five minutes. I would like to just spend one minute dealing with the integration issue as it relates to this matter, because I think it's very, very important to explain that as a whole from everything. First of all, Fidelis, it was undisputed Fidelis actually properly complied, the entity that Mr. Furman controlled, properly complied with all the requirements for registration. Our case leading up to it all was based on the fact that Fidelis was registered and that when you're dealing with unregistered securities or fraud, you look at issues on a transaction by transaction basis. The defense was based primarily on the fact, or one of the biggest defenses, including credibility, was based on the fact that Mr. Furman was properly registered. During cross-examination, the SEC asked questions about certain immaterial misstatements on the registration form, which under federal law does not impact the exemption. Then during closing, the SEC referenced the registration form misstatements to claim that Mr. Furman had engaged in fraud. The same time, Judge Ruiz prohibited us and refused to instruct the jury on a request instruction that these exemptions or the security sales were otherwise exempt from registration, which prejudiced us because that was the only question that the jury asked. So that not only prevented the unregistered securities or claims from going forward, but it also prohibited us from defending against the fraud claims because essentially by prohibiting or not instructing the jury in saying registration is not material, after, by the way, Judge Ruiz acknowledged that the SEC couldn't prove an integration claim if it tried, he still collapsed the transactions and treated them all as an indirect one when the case law dealing with indirect sale of securities deals with somebody who's involved in the transaction not signing it. So if I'm preparing a contract, handing it to you, putting you in touch with the people, that's indirect, as opposed to where I sell funds in a separate group, then that fund purchases securities through the pooling, which is why the integration doctrine was created back in the 1920s to deal with these issues, which the SEC didn't plead or prove. Thank you. All right. Thank you very much. Good morning. May it please the Court. Brooke Wagner for the Securities and Exchange Commission. After an eight-day trial featuring 18 witnesses, a jury found Michael Furman liable for six counts of securities fraud and for violating Section 5. As the jury found, Furman acted essentially as a sales agent for par funding, a merchant cash advance business that's been the subject of several appeals. He'd solicit individuals to invest in par funding, take their money and send it up to par funding in exchange for unregistered promissory notes offering interest on the funds. To do so, he would speechlessly tout the investment, misleading investors as to core aspects of the business and depriving investors of the information they needed to make an informed decision. The jury properly found this conduct violated the securities laws and the district court reasonably ordered Furman to pay disgorgement and one civil penalty. I'd like to just turn to the issues raised by opposing counsel, if I may, in turn. So on the issue of discovery and asking for a more definite statement, I think Your Honor is completely right to note that the discovery deadline had long since passed and, in fact, in denying the request for this more definite statement, the magistrate judge ruled that there was no lack of notice because the complaint was detailed, the TRO and PI proceedings were detailed, there was plenty of discovery to make the information clear. Why long since passed? He said it was almost two weeks. What do you say? I apologize. I don't have the dates at my hand, but I believe that there was more than a couple of weeks. But in any event, the magistrate judge ruled substantively that there was no lack of notice and that the SEC was not required to provide more information than it had already made available to the defendant. And I would note that Mr. Furman did not separately appeal that magistrate judge's ruling to the district court. Was there a discovery going from the SEC to Mr. Furman before trial? Yes, the SEC made its entire file available to Mr. Furman. That, again, that was... I apologize. It's one thing to make your file available and tell opposing counsel, come and look at it, it's all there, but he was proceeding pro se for a period of time, right? He was. He was originally counseled and then went pro se. So my question is, was there any discovery that was sent from the SEC to Mr. Furman either when he was pro se or when he was counseled with regards to the allegations forming the basis for the complaint? I don't know whether, if you're asking whether there were interrogatories about this or something like that, that the SEC... You can only ask. Right. And can the SEC, in an interrogatory, tell me what material misstatements you think I made that you're basing your claim of fraud or something else on, right? Right. I'm not aware of that, but again, I think that the magistrate judge's ruling that Mr. Furman had had fair notice of the claims against him and of the facts supporting those claims, I think, was reasonable, and I think, again, that Mr. Furman didn't independently appeal that. And I think that the fundamental question here is whether he had fair notice going into the trial, and I believe that he did. Was the preliminary injunction preceded by a contested evidentiary hearing or was it agreed to? There was a hearing that ultimately the parties consented to the entry of preliminary injunctions. So there was significant discovery material appended to the preliminary injunction, in connection with the preliminary injunction. So there was the parties' consent to the entry of a preliminary injunction before any contested evidentiary hearing took place? I believe there was an evidentiary hearing, but I would just want to double-check that. I apologize. It's a lengthy file here. If I could turn to the Fifth Amendment issue, if I may. Mr. Furman complains that the district court here did no balancing. I think, in fact, the district court did ample balancing and arrived at what it called a hybrid solution to resolve the fact that Mr. Furman had previously asserted the Fifth Amendment, had provided no discovery, had provided no responses in response to requests for admission, and then on the eve of trial sought to amend those. So the district court reasonably said that he could not amend those. They were still in play, but he could testify about anything that was covered in his deposition. And, in fact, because he talked about many things in his deposition, he was able to essentially testify freely over the course of three days. As Mr. Furman concedes today, there's nothing that he was prohibited from talking about, and he was free to explain his prior invocation of the Fifth Amendment. So I don't believe that there's any prejudice here, certainly not prejudice sufficient to warrant overcoming the jury's verdict. I also don't believe Mr. Furman has, in fact, pointed to a curative instruction that he asked the judge to provide. So I don't believe that there is any error there or prejudice. If I could turn to the matter of the Mr. Sharpe and the chart at issue. So Mr. Sharpe testified about a schedule. Where did the chart come from and how it was prepared? Was it from the bankruptcy proceedings? Is that where it came from? No. My understanding is that this was a schedule of investors that was found in both the files of Fidelis and in the files of ABFP, which served as sort of a back office for Fidelis. Okay. So this came from the defendant's files, this chart. That's right. And so the receiver identified that this file was in the chart, that this chart was in the files of both companies, which it was at the time overseeing as part of the receivership. Tell us what's on the chart. So the chart is a schedule of investors. It lists, you know, all of the investors who've invested for a particular note on a particular date. Exactly, exactly. The principle, the interest, when the interest begins, when the interest ends, that sort of information. And I understand that all that money then went to PAR funding. Is that how this worked? That's right. So individuals would give money to Fidelis in exchange for a Fidelis note. Fidelis would bundle that, so there might be two or three investors. That would, the money from two or three investors, that would get sent up to PAR funding. And PAR funding would issue a note for that same amount with a set interest rate on top. So there would be, so let's say the investors were told they would get a 9% return, but the PAR funding note might offer 20% interest and the additional 11% would serve as compensation to Mr. Fuhrman for, you know, sort of in lieu of a commission. I think at one point, one of the PAR funding executives mistakenly refers to it as a commission. So the idea is then the 9% would get passed back to the investors and the additional interest on top would go to Fuhrman and Fidelis with a portion of that being allocated to ABFP for managing it. You can't. Investors have a Fidelis note. Yes. And then PAR funding gave a note to Fidelis. That's right. But the investors didn't get anything from PAR funding. Well, there were returns derived from PAR funding. They didn't pass them around in a document. No, they didn't get a certificate or something. No, there was no physical note. The idea is that Fidelis was interposed to provide an ostensibly separate note. You know, as we talk about, PAR funding originally issued notes directly to the public via sales agents or finders, but after state regulators sanctioned them for that practice. So it was part of the new vehicle. Exactly. I understand that. I'm just trying to see how the transaction, they gave the money to Fidelis, they got Fidelis. Exactly. Fidelis sent the money to PAR funding. PAR funding gave some kind of investment instrument back to Fidelis. Another promissory note, yes. Okay, but it did go back to an investor. Correct. Exactly. So you're just alleging that the scheme is all one scheme. Exactly. There are two notes, but they're really two halves of one whole, because the notes don't have any real independent existence. The Fidelis notes depend on the PAR funding note being issued to provide the returns, and it's the success or failure of the PAR funding venture that determines the success or failure of the investor's ultimate investment. And the PAR funding notes only get issued because the Fidelis notes come in with the funds to grant them. So to the integration point, that's why we say integration really isn't relevant here, because integration is a set of factors or an analysis that courts in the Commission use when an issuer makes a series of transactions, each of which viewed in isolation may appear to be exempt, but are really better understood as part of a broader project or broader distribution. It's a sort of horizontal relationship. The classic example is an issuer who makes an offering to a limited number of offerees at time A, and then again at time B, and then again at time C. But really, that was all done pursuant to one plan of financing, and it's better understood as one large offering. But here, it's not a horizontal relationship. It's a vertical one, because as I say, the two parts of this don't really exist independently. They rely on each other. So it's better understood as one transaction with multiple stages that we can look through rather than multiple transactions or offerings that we have to integrate. As some misrepresentations, fraud, is there anything about the structure that is inherently illegal? Well, the problem here is that the offering was not registered, and therefore was in violation of Section 5. So that's what makes it unlawful. Had investors been given the appropriate information about the appropriate issuer, then there wouldn't have been that violation. Can you talk a little bit about the witness's name? Mr. Hyman referred to a witness who he says had his recollection refreshed with some notes, and then he was not allowed to look at the notes. He says because of his investigative privilege. Yes, so I believe we're talking about the FBI agent Weizenstein, who was called in rebuttal. So he was appropriately a rebuttal witness. He gave testimony to contradict things that Mr. Furman said on the stand or said he couldn't recall making. He did not testify from notes. What happened was that after Mr. Weizenstein was cross-examined, the cross-examination suggested that his testimony was a late invention, that it was very convenient, that after meeting with the SEC so many times, he happened to remember this so well. And in response to that, the SEC elicited from him on redirect that he had taken contemporaneous notes, and they were consistent with the account he provided. And the district ruled that there was therefore no need to provide those, provide anything underlying that. So it's not that he had his recollection. He did not have his recollection refreshed by notes. He did not testify from notes. They were not put in evidence. He did not show those notes to you? No. Okay, let's talk about disgorgement. Yes. Tell me why you think the district court correctly calculated the sum. Yes. So the SEC's burden on disgorgement is to provide a reasonable approximation of a defendant's ill-gotten gains. As this Court has said, exactitude is not required, and the risk of uncertainty falls on the wrongdoer, and the calculation is within the district court's broad discretion. Here, the district court reasonably based disgorgement on the evidence at trial, namely the testimony of Sharp, the consultant for the receiver, and the schedule of investors that was found in both of these files. Mr. Furman complains that it's not accurate, but he was free to come forward to show why that calculation was inaccurate, and he did not do so. I think particularly here, where he did not provide, he asserted the Fifth Amendment, he did not provide a sworn accounting or other financial information. It is not sufficient to simply say, well, the SEC should have had more information, or just to say generally I believe that this document is inaccurate without showing why it is. I also note that the district court... The district court based disgorgement on what sum? The sum of investments into Fidelis? The amount was based on the proceeds from the unregistered offering, so the amount received by par funding less the amounts paid out to investors in ABFB, so the amount he retained from the unregistered offerings. Okay, how much money went from Fidelis to par funding, all par? I believe $12 million. How much went back to investors from par funding through Fidelis? So my understanding is that, I believe $12 million was raised for Fidelis altogether. Par funding paid Furman about $6 million paid back, and then of that about $4.64 was paid out to investors in ABFP. Just to note, again, one point that the district court did not make its determination on disgorgement based on the Fifth Amendment or precluding Mr. Furman from putting information. In fact, Mr. Furman attempted to put in bank statements and the district court reviewed them and simply found that the numbers didn't add up and they did not provide any credible concrete evidence to render the SEC's reasonable approximation of disgorgement unreasonable. The disgorgement was 1.8, so I would get 4.6 to the 1.8. I apologize if my numbers are slightly incorrect, but I believe... It was 1.8 million, right? It was, yes. And you said that Judge Jordan, that they paid back 6 and the investors got 4.6, but the investors had put in 12. So, where does it work? Well, I think the starting point for disgorgement here isn't the amount of money that Fidelis raised for par funding, though I just answered that the amount. The question is, so, what money Fidelis received from par funding and then what it, minus what it paid out. So, how much did it retain? It's the 6 point something minus 4 point something. Exactly, exactly. Back to the 1 point something. Exactly, exactly, ballpark. I'm happy to answer any other questions. Otherwise, we would ask that the court affirm. Thank you. Thank you very much. I'd like to start by making... Before you start, did you request a jury charge on the 5th Amendment or are you just saying the district court sua sponte? I couldn't find where you requested a jury charge. Actually, file one. The 5th Amendment issue was a separate matter in terms of the jury charge. With respect to the jury, I don't believe we did. Did you give the district court a jury charge? I do not believe we did. Did you ask even for a jury charge or are you just saying you should have done it? At this juncture, I don't believe we did at that time. I'm happy to answer. Go ahead. I'd like to start off by clarifying the record. I watched SEC counsel show Mr. Weisenstein the notes that he reviewed beforehand. On cross, he testified his sole recollection was the notes he reviewed before testifying. In your approach, does the written transcript say one way or the other? How that redirect examination played out? My recollection of it all was that on cross, the question was, do you have any independent recollection outside of your notes? No. He was asked about, were you testifying with your notes? Yes. Did you go through these notes with SEC before you testified today? Yes, I did so outside the courtroom right there, based on those notes. Did that help impact your testimony? Yes. So maybe you're both correct in a sense. He was not shown the notes on the witness stand. Correct, but the SEC counsel had the notes saying, did you recall this? Asking him the questions after having gone through those very notes with him right before putting them up on the stand. Right, that may or may not make a difference, but he was not he was not given the notes on the stand to review as he testified. Correct. He was reviewing the notes before he took the stand. Yeah, it's the same basic thing as refreshing your recollection. It's just they're not on the stand, it's right beforehand. You know, if you hand your witness right as they're going up on the stand, a piece of paper to look at something, it's no different than waiting for them to be on the stand all of a sudden. I'm not sure that's right because lawyers prepare witnesses all the time. You can show them all sorts of documents and exhibits and you refresh recollection when you show somebody something on the stand. Isn't that the way it normally works? It is the way it normally works, but where somebody goes out of their way to circumvent the rules, which is immediately before having a witness testify, showing them notes that they prepared, asking them questions based on those notes, and prohibiting the other party from seeing them is a different situation. Before we go into this, though, I'd like to at least use some of the other time to deal with the inherently inconsistent statements or position that the SEC is asking this Court to look at and take as it relates to the registration issue. The SEC is saying, basically arguing the doctrine of integration applies and explaining the doctrine of integration to you as it relates to this case. Fidelis and Mr. Fuhrman never solicited an investor for par funding. There's no evidence to show they solicited investors for par funding. They were a pass-through. It was, and this is why integration exists in terms of dealing with these situations. What did Fidelis tell investors? That you're investing in Fidelis. We're going with us, we'll invest it, and we'll give you a rate of return of X. Is that what they told investors? Correct. And who did they tell investors they were going to invest with or how? They were predominantly investing with par funding, but they had the right and ability to invest with other funds. And it's not quite accurate to say that the investors didn't know that their money was going, at least in part, to par funding. Well, you have to look at the structure of these transactions as a whole, the nature of how they worked, and what actually happened. No individual investor could go to par funding itself and ask for documents, records, or otherwise. The SEC, in terms of dealing with the definition of the indirect solicitation of securities versus a pass-through registration, are two distinct concepts and that are created for different legal purposes. But even if we assume, for example, that Mr. Furman would have counted as an issuer for par funding, we elicited testimony concerning par funding's exempt status as well through Mr. Cole, who testified that they had registered, and other issues which should have at least given us a right to have that being brought to the jury. So essentially the position that the SEC took was that Mr. Furman was to be treated as an agent for par funding for purposes of liability, but that he was to be treated separately as an agent of Fidelis for purposes of raising his defenses. And the issue is that, in other words, what I mean by that, Your Honor, is the SEC said Mr. Furman's engaged in the sale of unlicensed securities for par funding. Our defense was twofold. First of all, that Mr. Furman was never involved in par funding. It was through Fidelis. It's a separate entity, separate note, separate transaction. But to the extent that there's the jump-through, it's supposed to be viewed as a single consolidated transaction without evidence showing how it should be consolidated, then Mr. Furman should have also otherwise been allowed to raise in defense the argument that par funding itself was exempt. Or at least there should have been a jury instruction because there was testimony from Mr. Cole, and actually the registration exemption applications were all applied for and submitted into evidence. But Mr. Furman was prohibited by the trial court from entering or otherwise having the issue of whether or not the par funding sales could have been exempt as well. You're two minutes over your time, but I'll give you one more minute to wrap up. And I guess the last kind of point, Your Honor, deals with the issue of the disgorgement, the chart that was prepared by Mr. Sharp, and the issues in this case. First of all, Ms. Wagner's explaining to you that there's these numbers, that they were determined and everything else. What she didn't explain was where the numbers actually came from. Where they came from, she says, Fidelis' offices. That's not what Mr. Sharp testified to, though, when he was up there. What did he say? He said he didn't know. He wasn't sure where it was from, but that it was a spreadsheet that said Fidelis. And the problem with this is that if you have an Excel spreadsheet with numbers on it, without figuring out where it comes from, what it means, or how it exists, there's no way to actually verify whether or not the numbers that were actually put in there Did you find that it was not a document found in the company's files? Yes, we did go through that, and that was our objection as it related to authentication and the failure to lay a foundation for it as a business record. Didn't the Nevada SEC say this was a document found in the files or saved to the judge? The judge, then, this is where the judge came back during a break and read a case law that says a receiver can have a relaxed standard for bringing in business records, even though that case law didn't apply, because in the case that was... Can I ask you one question? Did the receiver get it from the files? I mean, he was a receiver, so the receiver is in charge of the files of the companies the receiver of. So is that where the documents came from, the receiver who's in charge of the files? I believe the documents came from a company called AFPB, which was not actually our client. And it was a rough, at least the document that was used, in reality, was a rough number that wasn't accurate. AFPB is a management company that was run by... that did some back office work for Fidelis a little bit for a short period of time. It was mostly Fidelis, because there's Fidelis, which was separate from PAR funding. And this chart had no knowledge of it, and Mr. Furman did submit a declaration explaining where the numbers came in, where the expenses were, and how the chart wasn't accurate because it was double-counting some of the investments. Actually, that wasn't part of the jury trial. So the district court heard all that. So the chart was introduced just as an exemplary kind of document to say, hey, this is the money, this is the big picture to the jury. The district court making the disgorgement ruling heard all this. Correct, but then at the same time, we weren't allowed to cross-examine him about all of those issues concerning the veracity of it or the numbers, because that wasn't at issue. We weren't put on notice that this five-minute testimony from Mr. Sharp concerning an unauthenticated chart would be the sole basis for disgorgement against our client. All right. Thank you all very much.